**IN THE UNITED STATES DISTRICT COURT
EASTER DISTRICT OF ARKANSAS
WESTERN DIVISION**

**ANTOINE SCOTT**                                                                                                **PLAINTIFF**

Vs.                                            **CASE NO. 4:19-cv-00044**

**UNION PACIFIC RAILROAD COMPANY**                                                **DEFENDANT**

**FIRST AMENDED COMPLAINT**

Now comes the Plaintiff, Antoine Scott, by and through his counsel Lloyd W. "Tre˝" Kitchens, of The Brad Hendricks Law Firm, and for his First Amended Complaint states:

**INTRODUCTORY STATEMENT**

This is an action to redress employment discrimination, including harassment and disparate treatment, failure to promote based upon race (African American), and for retaliation in violation of Title VII; for a permanent injunction prohibiting the Defendant from engaging in the policies and practices alleged herein in violation of Title VII of the 1964 Civil Rights Act (as amended by the Civil Rights Act of 1991), 42 U.S.C. §2000e, *et.seq.*, and the Arkansas Civil Rights Act of 1993, A.C.A. 16-123-101, *et.seq.* This action is also brought pursuant to 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991. Plaintiff seeks full back pay as the result of his discriminatory failure to be promoted, benefits, compensatory and punitive damages, liquidated damages, prejudgment and post-judgment interest, reasonable attorney's fees and expenses, and any and all other relief to which he is entitled as the victim of racial discrimination, harassment and retaliation. As a direct result of the racial discrimination, harassment, and discharge suffered by the Plaintiff, he has suffered damages, including the loss of significant employment compensation, for which he seeks the relief set forth, *infra*.

1

## JURISDICTION

1.      The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343(3) and (4), 42 U.S.C. §2000e, *et.seq.*  Plaintiff also seeks a permanent injunction and a declaratory judgment under 28 U.S.C. §§2201 and 2202, declaring that the Defendant discriminated and retaliated against him in the terms and conditions of his employment.  This Court also has jurisdiction over Plaintiff's claims under the Arkansas Civil Rights Act pursuant to the plenary power of the Court to invoke its pendant jurisdiction over causes of action arising under the laws of the State of Arkansas.

2.      Venue herein is proper under 28 U.S.C. §1391(b) and 42 U.S.C. §200E-5(f)(3), and the alleged unlawful employment practices were committed within the State of Arkansas, in the Eastern District thereof.

3.      Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission alleging racial discrimination and harassment, charge no 493-2018-01118.

4.      The Equal Employment Opportunity Commission issued to Plaintiff a Right to Sue on the race harassment and discrimination charge on 10/23/2018.  A copy of the Notice is attached hereto as Exhibit "A" and incorporated herein by reference.

## PARTIES

5.      Plaintiff was at all times relevant hereto a citizen of the United States and a resident of Pulaski County, Arkansas.  Plaintiff's race is African American, and therefore he is a protected person within the meaning of Title VII and the Arkansas Civil Rights Act.

6. Defendant Union Pacific Railroad Company ("UP") is a foreign for-profit corporation doing business in the State of Arkansas. UP's agent for service of process is the Corporation Company at 124 West Capitol Ave., Suite 1900, Little Rock Arkansas 72201.

## STATEMENT OF FACTS

7. Plaintiff was employed by Defendant on 02/05/2007.

8. Plaintiff was selected for a position only to be unfairly disqualified so that the hiring official, Andrew Steinkamp (WM), could cover the fact that he has not hired an African American in years.

9. The harassment, attempts to destroy Plaintiff's character, lack of training he received after being selected, and the favoritism of Jeremy Davis (WM) who was selected with Plaintiff, has caused Plaintiff unnecessary stress and has impacted his health and the welfare of his family.

10. After being hired on 02/05/2007 with Union Pacific Railroad, Plaintiff has spent most of his employment working in the North Little Rock yard as a switchman.

11. For the past three plus years Plaintiff has been a peer trainer.

12. Plaintiff applied for the yardmaster position in North Little Rock twice and was not selected.

13. Plaintiff applied for the yardmaster position on 10/18/2012. David Herbert (WM) and Dustin Gordon (WM) were selected at that time.

14. Plaintiff reapplied on 08/07/2013 and Marcus Modlin (WM) and John Petty (WM) were selected at that time.

15. Joey Barrett (WM) was selected after them.

16. Sam Shirley (WM), Johnnie Witham (WM) and Brian Rawls (WM) were all selected early 2017 for the yardmaster position.

17. On 07/27/2017 Plaintiff applied for the yardmaster position again and was happy to learn that the third time he was awarded the position.

18. However, on 01/19/2018 Plaintiff was unfairly disqualified by the Senior Manager, Andrew Steinkamp (WM), for "not having the want to" and "because Plaintiff wouldn't push the crews to work harder" even though he at no time observed Plaintiff throughout the training.

19. Plaintiff always believed that safety was the most important thing at Union Pacific but learned from Andrew Steinkamp (WM) that he was completely wrong.

20. Plaintiff's interview for the position was on 08/29/2017.

21. Andrew Steinkamp (WM) was the selecting official.

22. Manager Mike Scholts (WM) and Recruiting Manager Derwin Davis (BM) were on the interview panel.

23. Jeremy Davis (WM) and Plaintiff were both selected.

24. Jeremy Davis (WM) was hired in 03/18/2013 and is a former student of Plaintiff.

25. Jeremy Davis (WM) is good friends with Andrew Steinkamp (WM) and the yardmaster local chairman Brandon Roberts (WM).

26. Brandon Roberts (WM) and Andrew Steinkamp (WM) are great friends as well.

27. Around September 2017 Plaintiff learned from Darvis Rasberry (BM) that his name was brought up in the yardmaster meeting because it was said that Plaintiff argued with the managers, Steinkamp (WM) and Mike Scholts (WM), which was not true, about the fact that Jeremy Davis (WM) was starting before Plaintiff because he was their number one choice.

28. Clay Matthews (WM) also mentioned it when he came to the Freight House, where Plaintiff's classroom was, on 10/06/2017.

29. Plaintiff asked Brandon Roberts (WM), Andrew Steinkamp (WM), and Mike Sholts (WM) about start dates because he had a vacation scheduled to Disney World in October along with a wedding in Atlanta a few days after that trip. In response to Plaintiff's questions, white management put a label on Plaintiff as if he was an angry black man.

30. Plaintiff asked Mike Sholts (WM) when training would start, and he told Plaintiff Jeremy Davis (WM) would start three weeks before Plaintiff.

31. Plaintiff asked if that will start Jeremy Davis' seniority before Plaintiffs and Mike Sholts (WM) said yes, he was their number one choice.

32. At that time Plaintiff was training his replacement, Fred Ogle (WM) for peer training and Plaintiff did not go to the crest, (managers office and where the mainline and hump yardmasters work), for weeks.

33. However, Mike Sholts (WM) and Andrew Steinkamp (WM) repeatedly said Plaintiff stayed up there every day arguing about seniority in the yardmaster meeting.

34. Brandon Roberts (WM), yardmaster local chairman, called Plaintiff on 05/27/2017 and told him to put in for the position.

35. Plaintiff wrote a letter to the general chairman of the Defendant, Robbie Robelot, (WM) about the favoritism being displayed.

36. The first few days after being selected were very suspicious because Jeremy Davis's medical examination was being pushed ahead of Plaintiff's, as Plaintiff tried to get his medical exam started as soon as possible because the sooner it is completed the sooner the results would come back and Plaintiff could start training as a yardmaster.

37. Jeremy Davis (WM) was told to show up on September 1 at 10:00 a.m. and Plaintiff was scheduled on September 7 at 3:00 p.m.

38. Medical, LHI (Logistics Health Incorporated), claimed that it was because of Labor Day but when Plaintiff got to the clinic he asked the receptionist, whose name is Whitney, at the front desk if Jeremy Davis got his examination done and she said that she had to turn him away because she told the medical department that the audiology machine was not working for him to complete his physical.

39. The name of the facility is Southwest Family Practice, PC, 6924 Geyer Springs Rd, Little Rock, Arkansas 72209.

40. Plaintiff had a mandatory conference call on September 5 at 1:00 p.m. about new hire on the job scheduling and review so Plaintiff was trying to get his done as soon as possible.

41. Yardmaster training for Plaintiff was horrible. He was left alone a lot by those who were close to Andrew Steinkamp (WM), mainly Clay Matthews (WM) and Kevin Russell (WM). They are both yardmasters.

42. Plaintiff believed most of them were trying to force him to quit.

43. The very first day Plaintiff took notes for about 5 minutes and Clay Matthews (WM) said he had to go to the restroom and did not come back for two hours. He was downstairs with the managers.

44. Matthews even went to the bowl shanty, where the switchmen work, and started bad mouthing Plaintiff about how bad Plaintiff performed on his first two days in the tower to the switchmen in the bowl. But there was nothing for Plaintiff to perform poorly at because he had not received any training. Matthews would leave several times for thirty minutes at a time and even came back with Senior Manager Mike Scholts several times. When Matthews came back in

6

the tower around 2:00 p.m. on 10/23/2017 he would roll his eyes when Plaintiff asked questions and he did not want to answer any of Plaintiff's questions.

45. John Petty (WM) worked as the hump yardmaster across from Plaintiff and Matthews that day, which is where the train cars are separated and roll off of the hill into the sixty four tracks, same building and actually about twenty to twenty-five feet away from each other. John Petty could see that Plaintiff was there alone.

46. Manager Jeremy Elemendorf (WM), who was a yardmaster twice, came up there to sit with Plaintiff on his second day of training because he wanted to help when Matthews would leave Plaintiff alone with no access to login.

47. After eight hours the system would log Plaintiff off the computer and he would have to wait for Matthews to return.

48. Plaintiff worked under all the yardmasters USER ID's/names when he trained.

49. Defendant's Rule 1.27 Divulging Information says that employees are responsible for all activity with their assigned USER ID's and are responsible for protecting the confidentiality of information accessed. Sharing passwords is prohibited. Unauthorized use of another person's USER ID and password is prohibited.

50. Manager Jeremy Elemendorf (WM) expressed his concern with them leaving Plaintiff alone on the first two days to the managers and nothing was done about it.

51. Plaintiff told yardmaster Rasberry (WM) about it and he talked to Manager Keith Jones (WM) who then sent out an email on 10/26/2017 for trainees Not be left alone during training but it did not work.

52. Brian Rawls (WM) also left Plaintiff alone several times on 10/25/2017 and again on 10/26/2017.

53. For a trainee to be left alone during his first few days of training is extremely dangerous because the trainee is in control of all the trains moving through the main line and the yard. Any error could cause a catastrophe.

54. Plaintiff could never login to any computers as a yardmaster during his training. Plaintiff took notes, asked a lot of questions, took pictures, and never had any problems with any of the crews working for him.

55. Plaintiff believed that Andrew Steinkamp (WM) had no intention of qualifying him. Local union chairman Bill Gilmore (WM) shared Plaintiff's belief.

56. Gilmore talked to Steinkamp on numerous occasions in his office about Plaintiff starting training before Jeremy Davis before the start of his shift.

57. Plaintiff repeatedly reported to Steinkamp how he was being treated as far as training and Steinkamp ignored him.

58. Plaintiff started training on 10/23/2017, and he talked to Steinkamp a few times that week on the company line whenever Steinkamp would call and ask questions about certain trains, again during the week of 11/13/2017 when Plaintiff started training in the bowl, and on 11/27/2017.

59. Plaintiff was told multiple times that a request for him to get a login would be put in, but it was never done.

60. Plaintiff contacted OSS (Online Systems Services) and was told that Steinkamp put in a request for him during that first bowl week of 11/13/2017.

61. Plaintiff called back several days later because he still could not login and Plaintiff was told somehow the request was deleted but it showed that he put a request in.

62. Plaintiff then even put the request in himself with the help of OSS on 11/27/2017. Plaintiff asked manager Chad Billson (WM) to check his email and approve it since he was Plaintiff's assigned manager on 11/27/2017 but he never received the email to approve it.

63. Plaintiff was told by the yardmaster local chairman Brandon Roberts (WM) to train three to four weeks on the crest, two weeks on day shift, one week afternoon shift, and one week night shift, five weeks in the bowl, three weeks on days, two weeks on nights, and two weeks on days and two weeks on nights on the hump when he arrived to work on 10/24/2017.

64. Plaintiff worked three weeks on the crest and then went to the bowl. No one ever told him what time to be there for training. Only that training will pay for eight hours.

65. One night when Plaintiff worked with Steve Fisher (WM), Brandon Roberts (WM) told Plaintiff to work the bowl on days and follow Kevin Russell (WM) that week and make sure you get to see the turnover at 5:30 for that week so you can see how they come up with a plan for the day.

66. Plaintiff did as he was instructed and worked six straight days around that time leading into Thanksgiving from 11/7/2017 - 11/2220/17.

67. Plaintiff worked with yardmaster Brad Edwards (WM) on 11/29/2017 and on that day he was in the chair all day. Brad told Plaintiff that he would let Plaintiff run the show and see how he did, and the first shift guys pulled six hundred eighty-one cars out of the bowl tracks.

68. Mike Scholts (WM) called Brad Edwards (WM) as Plaintiff was leaving and asked if he had someone with him that day because the first shift did great that day then he saw Plaintiff walk into the bowl shanty.

69. The goal is seven hundred cars pulled in the bowl tracks each shift. Mike Scholts (WM) wanted to disqualify Plaintiff because Plaintiff was not training for tweove hours and that day, 11/29/2017, he saw Plaintiff leave the bowl shanty after being there ten hours.

70. On 11/30/2017 Brad did not let Plaintiff sit in the chair because the crews had gotten behind on building trains and he was receiving a lot of calls and emails from management about them being behind, so he apologized to Plaintiff and told him that he was not going to let Plaintiff get in the chair to train until he got things caught up but he never did on that day.

71. Plaintiff then got a call from Brandon Roberts (WM) on the morning of 12/01/2017, that Plaintiff was coming and going when Plaintiff wanted, and to go see Andrew Steinkamp when Plaintiff got to work.

72. Plaintiff tried to talk to Andrew Steinkamp about everything again with training and he did not want to listen. He said he would come up with a schedule for Plaintiff to work because he wanted Plaintiff there, every day, at turnover time at 5:30. Steinkamp told Plaintiff he would email it to Plaintiff. Plaintiff responded that he still could not receive any emails since Plaintiff did not have any access because he still had no login at this time. Steinkamp insisted on emailing it anyway

73. Greg Cobbs (WM), who is a former yardmaster showed Plaintiff how to pull it up when he made it down to the bowl that morning on 12/01/2017.

74. Plaintiff thought that he was done training on January 12 because he completed his four weeks on the hump, which was the final training location. Brandon Roberts would ask if Plaintiff heard anything from management and that he would keep coming in for training if he were Plaintiff because Jeremy Davis got two extra weeks of training.

75. Plaintiff came in that Monday, 01/15/2018 to talk to Andrew Steinkamp but he was off, so Plaintiff talked to Manager Doug Lee (WM) who called Assistant Manager Mike Scholts (WM) to see if Plaintiff was qualified. Manager Chad Billson was in the jeep with Manager Doug Lee when he called Manager Scholts. Scholts said he would have to talk to Steinkamp before he could tell Plaintiff anything and that he would call him.

76. Plaintiff called Steinkamp the next day on 01/16/2018 and he told Plaintiff to work the bowl the next two days and then the Hump on Friday because of some qualification so he could see Plaintiff work.

77. Plaintiff came into the bowl the next morning. Brain Rawls (WM), who is a new yardmaster, was working so Steinkamp showed up and sent Plaintiff to the hump around 10:30 a.m. because he thought Kevin Russell was working that day.

78. Then the next day, 01/18/2018, Plaintiff worked in the bowl with yardmaster Kevin Russell (WM). Plaintiff asked Kevin to log-in to the computer beside him and he told Plaintiff, "No, I'm not doing it, you've been training for three months and still don't have any access."

79. Plaintiff went to the crest to see Manager Chad Billson, whom Jeremy Elmendorf and Fred Ogle just so happened to be in his office and told him what was going on. Manager Billson said he would call Kevin Russell and tell him to login, but Plaintiff told him that he was coming in to let him know that Kevin Russell would not login for Plaintiff and Steinkamp would not do anything about it.

80. Plaintiff went back to work in the bowl, and he sat next to Kevin Russell in front of the computer for about an hour and he asked if Plaintiff wanted to sit in the chair. Plaintiff said yes and when he sat down, Kevin Russell had nothing written down on his turnover sheet. No train, no rails to send jobs to, nothing and then he said he was going to the bank and to the crest as

soon as Plaintiff sat down. The turnover sheet is where you keep up with what tracks the jobs went to, what tracks are for certain trains, where a train is being built and so forth.

81. Kevin Russell came back several hours later and told Plaintiff he must go to the hospital to see his daughter and that Steinkamp would come to sit with Plaintiff in a little bit. Steinkamp came up a few hours later. Plaintiff spoke to him and he did not say one word to Plaintiff, he just ignored Plaintiff once again and took a seat. After about an hour he started talking and asked questions about what was going on in the yard.

82. Plaintiff believes Kevin Russell and Andrew Steinkamp were trying to set me up. Plaintiff answered every question about everything that was going on in the yard after about an hour of him sitting there with Plaintiff. Plaintiff worked in the bowl alone a few hours before Steinkamp came up there to sit when Kevin Russell left.

83. The next day, 01/19/2018, Plaintiff went to work on the Hump and Steinkamp called Plaintiff downstairs and said that he was not going to qualify Plaintiff as a yardmaster because of, "not having the want to and because I wouldn't push the crews to work harder." He felt that Plaintiff did not put any effort into showing him that Plaintiff wanted to be a yardmaster.

84. Before that conversation, Plaintiff had not seen Steinkamp in weeks.

85. One night while Plaintiff was working on the hump he ran into Jeremy Davis (WM) on his way to the restroom and asked him if anyone watched him work to qualify him and he said, "No, I just walked in Drew's office and he asked was I ready to mark up and I said yes and then he said "I now blessed the yardmaster, and marked me up."

86. Jeremy Davis and Brandon Roberts are very close friends. Jeremy Davis has been trying to be a yardmaster for years from being on the AW board and spending a lot of time at the freight house with Plaintiff. The AW board is what employees can hold when a full-time position

is not available, and they work 2 days a week and Plaintiff was even over the scheduling for that as well. Jeremy Davis told Plaintiff he did not know how he was qualified.

87. Plaintiff emailed Steinkamp on 01/20/2018, and asked for a written statement on why he was disqualified and never received anything.

88. There is only one black yardmaster out of the twenty-six working yardmasters right now in North Little Rock and Pine Bluff and his name is Darvis Rasberry (BM). North Little Rock has a total of sixteen yardmasters and Pine Bluff has a total of ten.

89. Since Plaintiff has been working for the Defendant only four African Americans have been through the training Glen Stell (Company Officer), Darvis Rasberry, Greg Cobbs Jr., and Plaintiff, while eleven white employees have been given the opportunity and either quit or have gotten disqualified. Paul Clark, Jeff Sobczak, Dustin Gordon, David Herbert, Marcus L. Modlin, Sam Shirley, Johnnie Witham, Jeremy Elemendorf went up twice and quit, are all white males who have been selected, along with those working now Joey Barrett, John Petty, and Brain Rawls.

90. The one African American yardmaster that is working now was selected in 2011, Darvis Rasberry. There have been 8 white males selected since then even though some have quit.

### COUNT I
### VIOLATION OF 42 U.S.C.§2000e, *et.seq.*
### Racial Discrimination and Harassment

91. Plaintiff restates and incorporates herein by reference the preceding paragraphs of his Complaint as if set forth herein verbatim.

92. The Defendant, by and through its agents and employees, has discriminated against and harassed Plaintiff because of race (African American) in that Plaintiff was treated differently as compared to similarly situated Caucasian employees.

93. Additionally, the reason(s) given by the Defendant for Plaintiff's different treatment are a mere pretext for discrimination based upon Plaintiff's race.

## COUNT III
## VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT

94. Plaintiff restates and incorporates herein by reference the preceding paragraphs of his Complaint as if set forth herein verbatim.

95. The acts and omissions alleged herein are in violation of the Arkansas Civil Rights Act of 1993, A.C.A 16-123-101, *et. seq.*, in that the Plaintiff was subjected to discrimination in the terms and conditions of his employment based upon his race (African American), for which he seeks the relief set forth, *infra*.

## COUNT IV
## VIOLATION OF RIGHT TO BENEFITS UNDER CONTRACT

96. Plaintiff restates and incorporates by reference the preceding paragraphs of his Complaint as if set forth herein verbatim.

97. The Plaintiff had a contract of employment with the Defendant under the laws of the State of Arkansas. Such contract could not be terminated, nor could the Plaintiff be deprived of the benefits of the contract because of his race under the laws of the State of Arkansas.

98. Defendant intentionally deprived Plaintiff of the enjoyment of the benefits, privileges, terms, and conditions of the contractual relationship he had with the Defendant because of the Plaintiff's race.

99. Under Arkansas and federal law, an employer may not lawfully violate 42 U.S.C. § 1981 or the Arkansas Civil Rights Act by subjecting such an employee to a work environment that is hostile because of the Plaintiff's race.

100. Defendant violated 42 U.S.C. § 1981 by subjecting the Plaintiff to a hostile work environment.

### DAMAGES

101. Plaintiff restates and incorporates herein by reference the preceding paragraphs of his Complaint as if set forth herein verbatim.

102. Plaintiff, Antoine Scott, has suffered damages in an amount in excess of the minimal amount for Federal Diversity Jurisdiction ($75,000) for the following elements:

    (1) Loss of employment compensation, benefits and promotional opportunities in the past;

    (2) Loss of reputation and self-esteem; and

    (3) Mental anguish and emotional distress.

Additionally, Plaintiff seeks punitive damages up to the limits permitted by law for violation of Title VII and in an indeterminate sum to be awarded by a jury for violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff prays that this Court grant him the following relief against the Defendant:

(1) Grant Plaintiff a jury trial;

(2) For a Declaratory Judgment declaring that the Defendant has violated the rights of the Plaintiff as guaranteed by Title VII of the 1964 Civil Rights Act (as amended), 42 U.S.C. §2000e, *et. seq.*; the Arkansas Civil Rights Act, A.C.A 16-123-101, *et. seq.*, and 42 U.S.C. §1981 *et. seq.*;

(3) Grant a permanent injunction prohibiting the Defendant from engaging in the harassment or retaliation and practices alleged herein in violation of 42 U.S.C.§2000e, *et.seq.*; and the Arkansas Civil Rights Act;

(4) Award compensatory and punitive damages;

(5) Award reasonable attorney's fees and litigation expenses;

(6) Grant any and all other relief to which he is entitled.

*PLAINTIFF DEMANDS A JURY TRIAL*

Respectfully submitted,

***THE BRAD HENDRICKS LAW FIRM***
LLOYD W. "TRÉ" KITCHENS, ABN 99075
500 C Pleasant Valley Dr.
Little Rock, AR  72227
(501) 221-0444
(501) 661-0196 (fax)
tkitchens@bradhendricks.com