# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**ANTOINE SCOTT**                                                                                **PLAINTIFF**

**v.**                                       **Case No. 4:19-cv-00044-KGB**

**UNION PACIFIC RAILROAD COMPANY**                                          **DEFENDANT**

## OPINION AND ORDER

Plaintiff Antoine Scott alleges claims of race discrimination and retaliation against defendant Union Pacific Railroad Company ("Union Pacific") in violation of 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Arkansas Civil Rights Act, Ark. Code Ann. §§ 16-123-101 *et seq*. ("ACRA") (Dkt. No. 15, at 1).  Mr. Scott also claims that Union Pacific subjected him to a hostile work environment because of his race in violation of 42 U.S.C § 1981 (Dkt. No. 15, at 14-15). Before the Court is Union Pacific's motion for summary judgment (Dkt. No. 45).  Mr. Scott responded in opposition to the motion for summary judgment (Dkt. No. 53).  Union Pacific replied to the response (Dkt. No. 58).  For the reasons explained below, the Court determines that the Railway Labor Act, 45 U.S.C. § 151 *et seq*. ("RLA"), preempts and precludes Mr. Scotts' race discrimination and retaliation claims.  Accordingly, the Court dismisses Mr. Scott's race discrimination and retaliation claims and denies as moot Union Pacific's motion for summary judgment as to those claims (Dkt. No. 45).  The Court determines that the RLA does not preempt and preclude Mr. Scott's hostile work environment claim.  The Court, however, grants Union Pacific's motion for summary judgment as to Mr. Scott's hostile work environment claim (Dkt. No. 45).

I.       **Factual Background**

A.       **Union Pacific's Rule 56(e) Objections**

Union Pacific filed a statement of undisputed facts (Dkt. No. 46).  Mr. Scott filed an unsigned response to the statement of undisputed facts in which he admits some paragraphs, denies some paragraphs, neither admits not denies some paragraphs, and then admits in part and denies in part some paragraphs of Union Pacific's statement of undisputed facts (Dkt. No. 53, at 14-46).

Union Pacific addressed Mr. Scott's response to its statement of undisputed facts in its reply brief (Dkt. No. 58, at 2-11).  Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, Union Pacific moves to strike Mr. Scott's response to Union Pacific's statement of undisputed material facts that fail to satisfy the record citation requirements found in Rule 56(c) of the Federal Rules of Civil Procedure, that fail to satisfy Local Rule 56.1 of the United States District Court for the Eastern and Western Districts of Arkansas, and that fail to satisfy this Court's Orders (Dkt. No. 58, at 2).  Union Pacific further objects to Mr. Scott's reliance on particular documents attached to his response to the motion for summary judgment because they are unsworn, unsigned, and in one case, undated witness statements and because the documents were never disclosed in discovery despite specific interrogatories requesting this information (*Id.*, at 2-3).

Federal Rule of Civil Procedure 56(c) requires that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Under Federal Rule of Civil Procedure 56(e):

> If a party fails to properly support an assertion of fact as required by Rule 56(c), the court may:  (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Local Rule 56.1(b) of the United States District Court for the Eastern and Western Districts of Arkansas requires a non-moving party to supply the Court with a statement of material facts "as to which it contends a genuine issue exists to be tried."  *See Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011).

The Court advised Mr. Scott that in responding to Union Pacific's motion for summary judgment he must comply with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas (Dkt. No. 46).  The Court specifically stated that his response should "include legal arguments, *as well as affidavits or other evidence* to show that there is a genuine issue of material fact that must be resolved at a hearing" and that he must file a "separate, short and concise statement of the material facts as to which [he] contends there is no genuine dispute to be tried." (*Id*. (emphasis added)).  Mr. Scott did not file a separate statement of undisputed material facts in response Union Pacific's statement of undisputed facts, but he did respond to Union Pacific's statement of undisputed facts (Dkt. No. 53).

In his response to Union Pacific's statement of undisputed facts, Mr. Scott either does not respond to or neither admits nor denies the following paragraphs of Union Pacific's statement of undisputed facts:  76, 98, 102, 112, 136, 137, 141, and 142.  Accordingly, the Court considers the following paragraphs undisputed for purposes of Union Pacific's motion for summary judgment:  76, 98, 102, 112, 136, 137, 141, and 142.  Fed. R. Civ. P. 56(c).

Mr. Scott admits, in part, and denies, in part, the following paragraphs of Union Pacific's statement of undisputed facts:  2, 3, 10, 13, 14, 15, 23, 24, 48, 58, 85, 87, 101, 106, 109, 116, 135, 140, 148, and 151.  Mr. Scott does not cite to evidence in the record, however, to support his denial of any of the paragraphs except for paragraph 48.  A response that does not cite to evidence in the record does not comply with Federal Rule of Civil Procedure 56(c).  Accordingly, the Court considers the following paragraphs undisputed for purposes of Union Pacific's motion for summary judgment:  3, 10, 13, 14, 15, 23, 24, 58, 85, 87, 101, 106, 109, 116, 135, 140, 148, and 151.  *See Aunforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010) (self-serving allegations and denials are insufficient to create a genuine issue of material fact); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

Mr. Scott denies the following paragraphs of Union Pacific's statement of undisputed facts: 16, 26, 44, 45, 46, 50, 52, 53, 54, 55, 56, 57, 60, 61, 62, 63, 64, 66, 69 71, 72, 73, 74, 77, 78, 79, 80, 81, 82, 83, 86, 92, 93, 94, 97, 99, 104, 107, 108, 110, 114, 115, 117, 121, 122, 124, 125, 132, 134, 138, 144, 145, 149, and 150.  Mr. Scott does not point to evidence in the record, however, to support his denial of any of the paragraphs except for paragraphs 57 and 63.  A response that does not cite to evidence in the record does not comply with Federal Rule of Civil Procedure 56(c).  *See also Aunforo*, 614 F.3d at 807; *Davidson & Assocs.*, 422 F.3d at 638.  Accordingly, the Court considers the following paragraphs undisputed for purposes of Union Pacific's motion for summary judgment:  16, 26, 44, 45, 46, 50, 52, 53, 54, 55, 56, 60, 61, 62, 64, 66, 69 71, 72, 73, 74, 77, 78, 79, 80, 81, 82, 83, 86, 92, 93, 94, 97, 99, 104, 107, 108, 110, 114, 115, 117, 121, 122, 124, 125, 132, 134, 138, 144, 145, 149, and 150.

Mr. Scott cites to the Yardmaster CBA to support his denial of paragraphs 48, 57, and 63 of Union Pacific's statement of undisputed facts.  Accordingly, the Court denies Union Pacific's motion to strike Mr. Scott's responses to those statements of fact.

### B.    Union Pacific's Motion To Exclude Exhibits 1-3, 6, And 7

Mr. Scott attaches the following exhibits to his response to Union Pacific's motion for summary judgment:  (1) undated letter from Richard B. Hayes III (Dkt. No. 53, at 3-4); (2) January 19, 2022, letter from William Stephens (*Id*., at 5); (3) undated letter from Bill Gilmore (*Id*., at 6); (4) screen shots of computer screen showing attempts to gain access to log into computers (*Id*., at 7-9); (5) February 8, 2018, letter from Scott McMillan, Senior Analyst EEO at Union Pacific to Mr. Scott (*Id*., at 10); (6) roster printed from yahoo email account on January 21, 2022 (*Id*., at 11); and (7) printed weekly schedule with notes from Mr. Scott (*Id*., at 12).  Union Pacific argues that all of the attachments except for the screen shots from the computer screen and the letter from Mr. McMillan are incompetent for summary judgment purposes because they are not authenticated by being attached to an affidavit (Dkt. No. 58, at 8).  Union Pacific maintains that the letters contain inadmissible hearsay, and the documents should be stricken from the record (*Id*., at 10).  Further, Union Pacific contends that it asked in discovery for any witness statements or other documents relating to the factual allegations contained in this lawsuit (*Id*., at 10).  Mr. Scott responded, "[n]ot [a]pplicable." (*Id*.).  Union Pacific contends that Mr. Scott did not supplement his responses to identify these documents or witness statements (*Id*., at 11).  Finally Union Pacific argues that the exhibits add nothing of substance beyond speculation and conjecture (*Id*.).

The Court has reviewed the documents Mr. Scott attaches to his response to the motion for summary judgment.  The Court strikes from the record and has not considered in ruling on the motion for summary judgment the undated, unsigned, and unsworn statements of Mr. Scott's co-

workers (Dkt. No. 53, at 3-6).  *See Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) (finding unsworn and unattested statements purportedly from Banks's co-workers did not meet the standards required by Rule 56(c) to support a hostile work environment claim).  The Court also strikes from the record and has not considered in ruling on the motion for summary judgment the printed roster from Yahoo email account on January 21, 2022, and the printed weekly schedule (Dkt. No. 53, at 11-12).  These documents are not authenticated by an affidavit and were not provided to Union Pacific during discovery in spite of a valid discovery request to which these documents would have been responsive.

## C.     Statement Of Undisputed Facts

The following facts are taken from Union Pacific's statement of undisputed facts except where specified.  To the extent the parties disagreed on purported statements of undisputed material fact, the Court has not deemed those facts undisputed.  In reaching a determination on the pending motion for summary judgment, the Court has reviewed the record evidence in this case in the light most favorable to Mr. Scott, as the Court is required to do at this stage.

Union Pacific, headquartered in Omaha, Nebraska, employs over 42,000 individuals, and its 8,000-plus locomotive run on more than 30,000 route-miles of track in 23 states west of Chicago and New Orleans (Dkt. No. 46, ¶ 1).  Union Pacific's mission is to provide safe and reliable service to its diversified business mix of roughly 10,000 customers and safe and discrimination-free workplace to all its employees (*Id*., ¶ 2).  Union Pacific is—by policy—"strongly committed to equal opportunity in all employment matters." (*Id.* ¶ 3).  In addition to its EEO policy, which prohibits discrimination against individuals on all protected bases (including race), Union Pacific maintains certain processes established to ensure that its employees benefit from a discrimination and harassment-free workplace, including its EEO or "Values Line" hotline (*Id*., ¶ 4).  The hotline

is a toll-free, 24-hour service through which employees may either anonymously or by name, share concerns about the workplace (*Id.*, ¶ 5). Any employee who believes that he or she has been subject to inappropriate workplace conduct is empowered and encouraged to report such concerns through the hotline or a corresponding online complaint portal so that Union Pacific can conduct an investigation and take appropriate action (*Id.*, ¶ 6).

Union Pacific is also a "carrier" under the Railway Labor Act ("RLA"), and as such, its employment-related policies are governed by its labor agreements with unions representing various trades, including Yardmasters (*Id.*, ¶ 7). Union Pacific's labor agreement with its Yardmasters ("the Yardmaster CBA"), represented by the Sheet Metal, Air, Rail, Transportation ("SMART") Union, formerly known as the United Transportation Union ("UTU"), specifies the negotiated terms related to their pay, schedules, qualifications, hiring, seniority, and working conditions (*Id.*, ¶ 8). Union Pacific has opted-in to an all services rendered ("ASR") agreement, which means it is a self-managed collective bargaining agreement, and Union Pacific handles its own staffing decisions and issues related to its Yardmasters (*Id.*, ¶ 9). The current Local Chairman for Yardmasters in the SMART Union, elected by his peers, is Brandon Roberts, who has worked at the North Little Rock yard for the past 16 years (*Id.*, ¶ 10). As Local Chairman for Yardmasters, Mr. Roberts advocates for Yardmasters in the event of any grievances against Union Pacific under the Yardmaster CBA (*Id.*).

In the North Little Rock yard, there are three separate Yardmaster stations—the bowl, the hump, and the crest—managed by Yardmasters at all times (*Id.*, ¶ 11). Under the Yardmaster CBA, the North Little Rock yard is allowed five active Yardmasters per station, for a total of 15 active Yardmasters assigned to paid Yardmaster positions at any time (*Id.*, ¶ 12). At the time Union Pacific filed its motion for summary judgment, Union Pacific employed a total of 17

Yardmasters—15 active Yardmasters, and two inactive, or "cut back," Yardmasters (*Id.*, ¶ 13). Because the role of Yardmaster is complicated and vital to the safe and efficient operation of the yard, Union Pacific maintains a "cut back" roster of individuals who have trained and qualified as Yardmasters but who are not currently assigned to a Yardmaster position.  These "cut back" Yardmasters can step up to fill temporary vacancies due to an active Yardmaster's sickness or leave, and the "cut back" or inactive Yardmasters are next in line should an active Yardmaster's employment end, through injury, resignation, retirement, or termination means (*Id.*, ¶ 14).  This "cut back" system is a common practice among various trades at Union Pacific, as it allows for qualified, "cut back" employees to fill positions on an as-needed basis (*Id.*, ¶ 15).  In order to qualify for the "cut back," or inactive, Yardmaster roster, one must apply and be selected for a Yardmaster Trainee position and then qualify as a Yardmaster, based on the Company's discretionary assessment of the individual's "ability, merit, and fitness" as demonstrated during a training period. (*Id.*, ¶ 16).

A Yardmaster works in a high-stress environment (*Id.*, ¶ 17).  The North Little Rock yard has been Union Pacific's highest-producing terminal for the last several years (*Id.*, ¶ 18).  Its crews handle between 2,400 and 2,800 cars per day, which they build into at least 16 trains every day (*Id.*).  On average, 25 to 30 trains terminate in the North Little Rock yard each day and anywhere from 50 to 80 trains run through the yard each day (*Id.*)

In Mr. Scott's own words, part of being a good Yardmaster is:

> making sure that everyone gets home safely, making sure that you have done your best during the day, you've done all that you could to help everyone get home safely, along with the trains getting out in a timely fashion, like they're supposed to be delivered to customers.

(*Id.*, ¶ 19).

Inbound Yardmasters guide traffic that terminates in North Little Rock into the terminal in the yard.  They then process the yarded trains so that the outbound Yardmaster can build new trains out of those cars (*Id.*, ¶ 20).  As a production terminal, Yardmasters rely on three main metrics to measure productivity (*Id.*, ¶ 21).  "Uses" refers to the "percentage of cars that are scheduled to a train that actually make the train." (*Id.*).  The "uses" goal is at least 90 percent of scheduled cars making it to their trains, which is also how Union Pacific generates revenue (*Id.*).  The second metric is "first OS," which refers to "running your trains on time." (*Id.*).  The third metric is "train consist accuracy," or TCA.  TCA is "a safety measure" and an "inventory tool" to help Yardmasters keep track of any extra or lost cars, cars that are out of order, and what commodity is in each car (*Id.*).  These productivity and safety metrics are critical to the work of Yardmasters, and Yardmaster Trainees should know these terms "within just a few weeks of training." (*Id.*, ¶ 22).

The purpose of the Yardmaster Trainee process is to allow interested individuals to try their hand at performing the multi-faceted, fast-paced position of Yardmaster with the guidance and mentorship of an experienced Yardmaster who can instruct, advise, and step in so that an inexperienced Trainee does not cause any accidents or negatively affect productivity (*Id.*, ¶ 23).  The Yardmaster Trainee job posting to which Mr. Scott responded included clear statements of the job description, accountabilities, requirements, and work conditions (*Id.*, ¶ 24).  In particular, the posting stated that applicants "must have good prioritization and organization skills" and the "ability to multitask;" must "develop and maintain positive working relationships with coworkers, supervisors, contractors and/or customers and effectively handle conflict situations;" "must be willing to work in an enclosed space for an entire shift . . . willing to continuously stay in work

station except for brief breaks that traffic levels allow;" and recognize that "compliance with the applicable attendance policy is an essential function of this position." (*Id*.).

Yardmaster Trainees are expected to spend about three to four weeks, depending on the speed with which they display competence, training at each station under the guidance and supervision of an experienced Yardmaster (*Id*., ¶ 25).  Regular Yardmaster shifts are 12 hours long (*Id*., ¶ 27).  Although Yardmaster Trainees are not required to work the full 12 hours of each of their mentors' shifts, they are salaried employees, and they are expected to work "a minimum of 8" hours a day, "but most of them would stay for 10 or 12 . . . just to get that extra experience." (*Id*., ¶ 28).  If a Yardmaster Trainee wants to master all of the skills necessary to qualify as a Yardmaster, it is critical to make the most of the experience available at each shift and at each station because "the company allows 30 days per station" for training, and most Yardmaster Trainees "stay for 10 or 12 [hours] . . . just to get that extra experience . . . to make the most of it." (*Id*., ¶ 29).

Mr. Scott applied for a Train Service position with Union Pacific on or about November 17, 2006 (*Id*., ¶ 30).  Mr. Scott began his employment with Union Pacific on February 5, 2007, and held several trainman positions, including Thru Freight Brakeman, Switchman Brakeman, Thru Conductor, and Brakeman (*Id*., ¶ 31).  Mr. Scott applied for a Yardmaster Trainee position twice before the opening at issue—once in October 2012 and again in August 2013 (*Id*., ¶ 32).  In both of these application rounds, he was selected for an interview, and in the August 2013 round, he was named as an alternate Yardmaster Trainee (*Id*., ¶ 33).  As an alternate, Mr. Scott would have had the opportunity to step into the Yardmaster Trainee role if any of the Trainees quit during training (*Id*., ¶ 34).

In 2013, Mr. Scott became a Peer Trainer for Union Pacific (*Id.*, ¶ 35).  As the title implies, in his Peer Trainer role, Mr. Scott worked with his peers during their orientation periods and taught classes, working with management to try to make sure everything went well with new hires' training process (*Id.*, ¶ 36).  Mr. Scott worked as a Peer Trainer through mid-October 2017 (*Id.*, ¶ 37).

Mr. Scott testified that he applied for the Yardmaster Trainee position in 2017 "[b]ecause peer training normally is a job that lasts, like, two or three years, and then everybody just goes back to their craft, or wherever they was working.  And the time was close to being up for me as a Peer Trainer, so that's why I applied for it." (*Id.*, ¶ 38).

Mr. Roberts (Caucasian), Local Yardmaster Chairman, had heard from senior leadership and crew members who worked with Mr. Scott that he was "working as a peer trainer, and . . . that he was doing very well with that." (*Id.*, ¶ 39).  Based on this positive feedback, Mr. Roberts encouraged Mr. Scott to apply for the Yardmaster Trainee position (*Id.*, ¶ 40). Clay Matthews (Caucasian), a Yardmaster, also recommended to Mr. Scott directly that he apply for the Yardmaster Trainee position (*Id.*, ¶ 41).

Mr. Scott applied for the Yardmaster Trainee position for a third and final time in July 2017 and was again selected for an interview (*Id.*, ¶ 42).  Mr. Scott recalls that manager Mike Scholts and Human Resources representative Derwin Davis were on his interview panel (*Id.*, ¶ 43).

Mr. Roberts was also present for Mr. Scott's interview (*Id.*, ¶ 44).  Although Mr. Roberts does not participate in the actual selection of Yardmaster Trainees, because he is the Local Union Chairman for Yardmasters, Union Pacific "allows [him] to be at those interviews to . . . cast [his] opinion" regarding the candidates and "to have a voice." (*Id.*, ¶ 45).  In fact, Mr. Roberts put in

extra effort to be present for Mr. Scott's interview to advocate for him. (*Id.*, ¶ 46).  According to Mr. Roberts:

> I worked all night, I took a change of clothes with me; and after my shift, I got off, I went and freshened up down in the locker room, changed clothes, met my wife for breakfast, and then went to the interviews. And—just so I could be sure to be there, you know, to—to have a voice . . . to advocate for [Mr. Scott].

*Id.*

On August 29, 2017, after the interview process, Mr. Scott was selected as a Yardmaster Trainee (*Id.*, ¶ 47).

Another employee, Jeremy Davis (Caucasian), who had also interviewed during this application cycle, was selected as a Yardmaster Trainee as well, and he was the interview panel's unanimous first choice for the position (Dkt. No. 53, at 22, ¶ 48).

The Yardmaster CBA states: "In making promotion to yardmaster under the provisions of Article 11, ability, merit, fitness and seniority shall be considered. Ability, merit and fitness sufficient, seniority shall prevail." (*Id.*).  The Yardmaster CBA Article 11 provides: "Yardmasters included within the scope of this Agreement constitute one (1) seniority class . . . . Upon their successful completion of said training and being deemed by the Company to be qualified to work as a yardmaster, employees will also be given yardmaster seniority date retroactive to the date of their first paid training shift.  Where two (2) or more applicants have their first paid training shift on the same date, their relative seniority rank shall be based upon the length of their continuous service with the Company." (*Id.*).  This is why Mr. Scott worked hard to begin, if not before Mr. Davis, at least at the same time (*Id.*).

Mr. Davis had prior management experience and had earned a college degree (Dkt. No. 46, ¶ 49).  Although a college degree is not a requirement for a Yardmaster position, and while most of the Yardmasters at the North Little Rock yard do not have college degrees, completing the

coursework for a college degree shows "a high level of dedication . . . to see something through to the end." (*Id.*, ¶ 50). Although Mr. Davis was the panel's first choice for the Yardmaster Trainee position, Mr. Scott was its second choice, based on his application, interview, and his success and notable performance as a peer trainer (*Id.*, ¶ 51). Joseph Fisher, a black male, was selected as an alternate (Dkt. No. 45-4, at 19). Both Mr. Davis and Mr. Scott had the same opportunity to train and potentially qualify as a Yardmaster, and Mr. Scott admitted that they were not competing for a Yardmaster position (Dkt. No. 46, ¶ 52).

As is his custom, Mr. Roberts assigned Mr. Scott to experienced Yardmaster mentors at each of the three Yardmaster stations in the North Little Rock yard – Kevin Russell in the Bowl, Jim Osterheld for the inbound side, and Jay Harrison on the crest (*Id.*, ¶ 53). Mr. Scott repeatedly responded, "I don't know," when asked whether the Yardmaster position is a hard job (*Id.*, ¶ 54).

In September 2017, shortly after Mr. Davis and Mr. Scott were selected as Yardmaster Trainees, but before Mr. Scott's training began, Mr. Scott's name came up during a Yardmaster meeting regarding claims that he had been arguing with managers about seniority (*Id.*, ¶ 55). Specifically Mr. Scott was upset that Mr. Davis was "starting yardmaster training before [Mr. Scott] because [Mr. Davis] was their number one choice." (*Id.*).

Mr. Roberts observed that, by the time Mr. Scott started his training, he was a bit disenchanted because of the seniority decision, and it seemed "that he never got over that," but instead "he just allowed that to—to continue to eat at him through the process." (*Id.*, ¶ 56).

In an email Mr. Scott sent to Robby Robelot, a former Yardmaster and current General Chairman for the Union, Mr. Scott was asking questions in order to get clarity about the impact of seniority going forward should he be selected for the position of Yardmaster under the Yardmaster CBA, Articles 9 and 11 (Dkt. No. 53, ¶ 25). Mr. Scott's email to Mr. Robelot focused on his

seniority complaints and did not mention the word "race" (Dkt. No. 46, ¶ 58).   At his deposition, Mr. Scott admitted that when writing the email to Mr. Robelot, he was concerned not with race but rather with the manner in which the seniority rules were implemented and applied by the Union (*Id.*, ¶ 59).

In his Amended Complaint, Mr. Scott refers to Mr. Davis as "a former student of Plaintiff," meaning that as a Peer Trainer, Mr. Scott assisted Mr. Davis through his new hire orientation (*Id.*, ¶ 60).  Because Mr. Scott had been working for Union Pacific longer than Mr. Davis had, he felt entitled to seniority over Mr. Davis in the Yardmaster trade (*Id.*, ¶ 61).  Mr. Scott believes that his very selection as a Yardmaster Trainee was discriminatory "because [Mr. Davis] started training first.  He started training before I was, and then he was more qualified than I am.  I hired on in 2007, and I believe he hired on in 2013.  And I strictly believe that's because of race." (*Id.*, ¶ 62).  Mr. Scott testified that the reason that he believes Mr. Davis should not have been selected as the first choice for Yardmaster Trainee is "seniority," and "just seniority." (*Id.*, ¶ 63).  Mr. Scott bases his belief that seniority is at issue on the posting that states that it is, and references the Yardmaster CBA, Article 9 and Article 11 regarding seniority (Dkt. No. 53, ¶ 63).

In listing the alleged discrimination and/or harassment he claims to have faced, Mr. Scott highlighted the fact that "Jeremy Davis, a white male was hired on 3/18/1[3]. I was hired on 2/05/07 and Jeremy Davis was still Steinkamp's number one choice." (Dkt. No. 46, ¶ 64).  When faced with the possibility that Mr. Davis had prior management experience and a college degree, two factors which weighed in favor of his first-choice ranking, Mr. Scott still did not think it was fair for Mr. Davis to have been rated as more qualified than he was, explaining:

> I don't think it's fair, because it's based Union Pacific seniority.  I mean, how much working time did he have, you know, where he had straight working time as a switchman, whatever, compared to the time that even I had out there.

(*Id*., ¶ 65).  Unlike other positions for which seniority is based solely on length of time at Union Pacific, the Yardmaster position is a "right of selection" position, so Union Pacific can select any candidate for a Yardmaster Trainee position regardless of the candidate's seniority relative to other candidates (*Id*., ¶ 66).  Seniority among Yardmasters is based on the date one started Yardmaster training (*Id*., ¶ 67).

Mr. Scott alleges that Union Pacific manipulated the training start dates to allow wrongfully Jeremy Davis to start his Yardmaster Trainee training before Mr. Scott (*Id*., ¶ 68).  He claims that Union Pacific "can say [Mr. Scott] had to train Fred Ogle [his Peer Trainer replacement], but . . . [Mr. Ogle] was over with [Mr. Scott] already before . . . so all he needed was a little familiarization." (*Id*.).  However, Mr. Scott admitted that no one at Union Pacific told him that his need to train his replacement had anything to do with him starting Yardmaster Training after Mr. Davis (*Id*.).

Despite acknowledging that the "cut back" system is common practice at Union Pacific in various trades, Mr. Scott complained to Mr. Robelot about his selection as the second choice Yardmaster Trainee, asking, "Why would you hire 2 so they can say we have someone cut back?" (*Id*., ¶ 69).  When asked why he posed that question to Mr. Robelot, Mr. Scott stated that "It didn't happen. It wasn't like that much in the past," referring to "cut back" individuals filling positions as they became open (*Id*.).

Mr. Scott understood that Yardmaster seniority is based on an individual's training start date (*Id*., ¶ 70).  Mr. Scott discussed his frustration over the seniority issue with Mr. Roberts, and Mr. Scott was "adamant that . . . he should have started first because of his [overall] seniority." Mr. Scott told Mr. Roberts that the seniority factor was "going to be a tremendous setback" and that he was concerned that it might be many years before he could actually hold a Yardmaster

position (*Id.*, ¶ 71).  Mr. Scott raised concerns to Mr. Matthews, a Yardmaster, about Mr. Davis starting training before him (*Id.*, ¶ 72).  Mr. Matthews told Mr. Scott that he had heard other Yardmasters talking about how Mr. Scott was arguing with managers about Mr. Davis starting training before him (*Id.*, ¶ 73).  Mr. Scott did not avail himself of any of the remedies in the Yardmaster CBA available to Yardmasters who believe they have received unjust treatment (*Id.*, ¶ 74).

Mr. Roberts, Local Union Chairman for Yardmasters and the individual responsible for organizing the Yardmaster Trainee training schedules, has worked for Union Pacific for more than 16 years and has served as an inbound Yardmaster for about the past ten years (*Id.*, ¶ 75).  Mr. Roberts observed some of Mr. Scott's training firsthand (*Id.*, ¶ 76).  Mr. Roberts' overall impression of Mr. Scott's attitude toward training was that "he almost looked for an opportunity to leave the tower as often as he could." (*Id.*, ¶ 77).  During his Yardmaster training, Mr. Scott repeatedly showed up after his shift began or left work before the full 12-hour shift was complete (*Id.*, ¶ 78).  On at least two days within the first few weeks of training, Mr. Scott did not report to training and did not call his supervisor to inform him of an anticipated absence (*Id.*, ¶ 79).  Mr. Scott does not think he had any personal responsibility to ask a manager what hours he was expected to work even when he was unsure of his training schedule after asking a Yardmaster (*Id.*, ¶ 80).  Mr. Roberts called to check in on Mr. Scott, as he does with all trainees, and he discovered that Mr. Scott was not present for turnover at the beginning of his shift.  Mr. Roberts recalls the following exchange:

> . . . I checked on him again.  Again, he wasn't—he wasn't there, so I called him. This would have been . . . [Page 30] between 6:00 and 6:30, I'd say.  He wasn't there.  So I called him and he didn't answer.

He called me back about an hour later.  And, you know, I asked him . . . hey, man, I was like, you know, are you coming in today?  You know, what's going on?  Where are you at?

And he's just like, look, I'll be there when I get there.

And I said, "Yeah, well, that's—that's not going to work for me."  I said, "That's not how this works . . . you need to be there by 5:45, so be there for turnover and the start-of-shift plan.  That sets your tone for the whole day.  It's the most important part of your day.  You're going to have to be there for that."

And he said, "Look, man, I got kids, I got a wife, like I said, I'll be there when I get there."

And then he hung up on me.

(*Id.*, ¶ 81).  Mr. Roberts described Mr. Scott's performance during training as "very lackadaisical.  He—he did not like spending much time in the chair actually doing the job." (*Id.*, ¶ 82).  The general consensus among the Yardmasters who observed Mr. Scott's training was that "he wasn't interested; he didn't want to be in the chair; he was flighty; he would just constantly [go] up and down out of the tower; going down, chitchatting with the switchmen, going over to the freight house to where his—chatting with the guy that was taking his position over there, going up to the crest and chatting with the managers." (*Id.*, ¶ 83).

Mr. Scott complains about not having login access as a Yardmaster during his training (*Id.*, ¶ 84).  Mr. Scott admits that on November 13, 2017, Mr. Steinkamp called OSS to request account-level access (*Id.*, ¶ 85).  Mr. Scott also admits that Mr. Steinkamp could not provide Mr. Scott with the access himself; rather, Mr. Steinkamp could simply do what Mr. Scott could have done himself—ask someone at OSS for assistance (*Id.*, ¶ 86).  Mr. Scott admits that Mr. Steinkamp submitted a request for Mr. Scott's access before November 19, 2017 (*Id.*, ¶ 87).   On November 19, 2017, Mr. Scott called OSS and learned that "his boss [Mr. Steinkamp] put in an idm for him to get a lan User ID and he still does not have access yet." (*Id.*, ¶ 88).  On November 27, 2017, Mr.

Scott called OSS again and "wanted to know if a request has been put in for LAN and Lotus Notes access." (*Id.*, ¶ 89). OSS informed Mr. Scott that Mr. Steinkamp had submitted a request on Mr. Scott's behalf but that the request had been deleted in the time that passed between Mr. Steinkamp's request and Mr. Scott's follow-up (*Id.*, ¶ 90). When these efforts to obtain access were not fruitful, Mr. Scott did not complain to Derwin Davis in Human Resources about his concerns (*Id.*, ¶ 91). Mr. Scott did not contact Mr. Roberts, as the Union's Local Chairman for Yardmasters, for help with his access issues (*Id.*, ¶ 92).

During his training, Mr. Scott was unable to login as a Yardmaster, but Yardmaster Trainees and qualified but "cut back" Yardmasters work under the active Yardmaster's login during any training activity (*Id.*, ¶ 93). This is because the train sets, or any other information needed during the training, will have the Yardmaster's ID attached to it so that if there are "any questions . . . any red flags, anybody [who] needs to get ahold [of the Yardmaster] . . . they will come to [the Yardmaster]" who is overseeing the training and who is ultimately responsible for everything that happens in the yard during his or her shift, regardless of whether a trainee was sitting in the seat at the time (*Id.*, ¶ 94).

Like Mr. Scott, Mr. Davis applied for the Yardmaster Trainee position twice before the 2017 interviews at issue (*Id.*, ¶ 95). Also like Mr. Scott, Mr. Davis was ranked as an alternate during his second application for the Yardmaster Trainee position (*Id.*, ¶ 96). Mr. Roberts observed Mr. Davis during parts of his training and testified that he "was always on time," "was always there on his scheduled days," "took a lot of personal initiative," "stud[ied] the material at home," and "approached it much like a . . . college class." (*Id.*, ¶ 97). Mr. Davis "would frequently come in before his shift, stay after his shift, come up on his lunch break and shadow . . . Yardmasters and ask questions and . . . try to get a feel . . . for things and . . . express interest in

the job" (*Id.*, ¶ 98).  In comparing Mr. Scott's performance during training to Mr. Davis's, Mr.

Roberts testified:

> Antoine was very lackadaisical.  He . . . did not like spending much time in the
> chair actually doing the job.  Mr. Davis was just the opposite.  He wanted to be in
> the chair as much as possible.
>
> . . .
>
> I mean, like I said, the difference—you know, like night and day.

(*Id.*, ¶ 99).

When asked whether Mr. Davis was a good worker, Mr. Scott responded, "Do I have to

answer that?"  He then stated, "Do I think he was a good worker, I don't know." (*Id.*, ¶ 100).  Mr.

Scott has no knowledge regarding the hours Mr. Davis spent during his training (*Id.*, ¶ 101).  Mr.

Davis did not have attendance issues during his training (*Id.*, ¶ 102).

Mr. Scott believed that his training was over on January 12, 2018, after nearly three months

of training under experienced Yardmasters in the Crest, the Bowl, and the Hump (*Id.*, ¶ 103).

However, Mr. Roberts told Mr. Scott that he should keep coming in for training until he heard

from management (*Id.*, ¶ 104).  The following week, Mr. Scott talked to Mr. Steinkamp, who told

Mr. Scott to "work the bowl the next 2 days and then the Hump on Friday because of some

qualification so he could see [Mr. Scott] work." (*Id.*, ¶ 105).  On January 18, 2018, Mr. Steinkamp

sat in the tower with Mr. Scott to observe him perform Yardmaster duties (*Id.*, ¶ 106).  After

observing Mr. Scott's skills quietly for a while, Mr. Steinkamp began asking Mr. Scott questions

about what was going on in the yard, where the crews were working, what train Mr. Scott was

working on, where the hostlers were, etc. (*Id.*, ¶ 107).  Mr. Scott described his attitude on the day

Mr. Steinkamp observed him in the tower as "confused." (*Id.*, ¶ 108).

The next day, January 19, 2018, Mr. Steinkamp called Mr. Scott into his office and informed him that he had not qualified for the position of Yardmaster because Mr. Scott did "not hav[e] the want to and because [he] wouldn't push the crews to work harder" and because Mr. Steinkamp felt "that [Mr. Scott] didn't put any effort into showing [Mr. Steinkamp] that he wanted to be a yardmaster." (*Id.*, ¶ 109). Mr. Scott disregarded Mr. Steinkamp's assessment of his ability to perform as a Yardmaster because "[he doesn't] think [Mr. Steinkamp] had any intentions to qualify [Mr. Scott] at all anyway, and [he] just felt like [Mr. Steinkamp] just—it was just a—it was just a show. It was just a coverup, really . . . that's just how [Mr. Scott] feel[s]." (*Id.*, ¶ 110).

More than a week after learning that he had not qualified as a Yardmaster, Mr. Scott utilized Union Pacific's Values Line to report concerns of alleged discrimination (*Id.*, ¶ 111). This was the first time Mr. Scott had raised the issue of discrimination in relation to the Yardmaster Trainee selection and qualification process (*Id.*, ¶ 112).

The description of his original internal complaint lodged on January 29, 2018, is as follows:

> Ongoing since 1/19/18, Antoine was scheduled to complete a three month [sic] training in efforts to move into a yard master position. During the course of his training, Antoine had a difficult time logging in and accessing his work station, and received minimal support from Andrew Steinkamp with correcting the issues. The issue caused a delay in Antoine being able to effectively do his training and work. Antoine was competing for the open position with another employee, who was a friend of Andrews [sic]. Antoine was informed by Andrews he was disqualified from the position due to "not having the want to, and not pushing the crew to work harder." Antoine believes he did not have a fair chance for the open position due to Andrew having plans to hire his friend, and also was considered for the position to avoid an Equal Employment Opportunity (EEO) violation.

(*Id.*, ¶ 113).

In his Values Line complaint, Mr. Scott did not complain of discrimination or retaliation, but rather Mr. Steinkamp's alleged friendship and "conflicts of interest," as this call was categorized (*Id.*, ¶ 114). Mr. Scott's Values Line complaint does not mention any specific

instances of discrimination, harassment, or retaliation based on his race or any other category (*Id.*, ¶ 115).   In his complaint, Mr. Scott quotes the legitimate, non-discriminatory reason Mr. Steinkamp gave him for not qualifying him as a Yardmaster—that he did not "hav[e] the want to," and did not "push[] the crew to work harder." (*Id.*, ¶ 116).   On April 26, 2018, Union Pacific's EEO Department issued a letter to Mr. Scott informing him that after a joint investigation with senior management into possible discriminatory practices alleged in his complaint, "no EEO violation has been noted." (*Id.*, ¶ 117).

On July 17, 2018, Mr. Scott filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging only claims of race discrimination in connection with his failure to qualify for the Yardmaster position (*Id.*, ¶ 118).   After conducting its own investigation into Mr. Scott's claims, on October 23, 2018, the EEOC issued a Dismissal and Notice of Rights letter informing him that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (*Id.*, ¶ 119).

In his Amended Complaint, Mr. Scott alleges "employment discrimination, including harassment and disparate treatment, failure to promote based upon race (African American), and . . . retaliation." (*Id.*, ¶ 120).   Mr. Scott admitted that he has no support for his belief that the Union predetermined the selection of Yardmaster Trainees (*Id.*, ¶ 121).   Mr. Scott does not accept that his poor performance during training prevented him from qualifying as a Yardmaster; instead, he posits that Mr. Steinkamp was planning to hire Mr. Davis all along based on an alleged friendship, not racial animus (*Id.*, ¶ 122).   Mr. Scott has repeatedly accused various Union Pacific Yardmasters of exhibiting preferential treatment based on friendship, saying "that their [Brandon Roberts' and Jimmy Harvey's] friends are getting these positions, their friends, their boys are getting these positions." (*Id.*, ¶ 123).   Mr. Steinkamp has a collegial working relationship with Mr. Davis, but

the two are not "friends" in the colloquial sense outside of the workplace (*Id.*, ¶ 124).  They do not visit one another's homes, go out for dinner together, hunt or fish together, or spend any purposeful time together outside of work (*Id.*).

Mr. Scott admits that he did not complain to anyone during his training that he felt he was not receiving sufficient training (*Id.*, ¶ 125).  Mr. Scott believes that Mr. Matthews discriminated against him because Mr. Scott "think[s he] was set up from the beginning to fail, and [he doesn't] think that they tried to help [him] whatsoever through the entire training." (*Id.*, ¶ 126).  Mr. Scott believes that he was set up to fail because of he had "no access," he was "left alone," and he did not receive answers to his questions (*Id.*, ¶ 127).  However, Mr. Scott did mention that when Mr. Matthews left him alone, Jeremy Elmendorf, a qualified Yardmaster and manager, "was there, and he just made sure that if [Mr. Scott] had any questions that [Mr. Scott] could just turn around and ask him." (*Id.*, ¶ 128).  Mr. Scott cannot recall whether he ever contacted Mr. Elmendorf after that first offer for assistance with any of his questions (*Id.*, ¶ 129).  Mr. Scott believes that the alleged discriminatory behavior by Mr. Matthews was racially motivated "[b]ecause the treatment.  And I think I don't, I don't—I wasn't treated fair, like I should be treated as a trainee, and I know because I was a Peer Trainer.  I trained, you know, over 200 people." (*Id.*, ¶ 130).  As a Peer Trainer, Mr. Scott trained new hires, not Yardmasters (*Id.*, ¶ 131).

Mr. Scott admits that he has no evidence to support his belief that he was "set up" on his last day of training except for his own suspicion "because of [Mr. Russell not] log[ging] in," and his "belie[f] that [Mr. Russell] and Steinkamp just planned it out that way." (*Id.*, ¶ 132).  Mr. Scott believes that during the last week of his training, Mr. Russell and Mr. Steinkamp came up with "a plan for [him] to work with [Mr. Steinkamp's] buddy so that [he] would fall apart and do horrible." (*Id.*, ¶ 133).

Mr. Russell helped Mr. Scott throughout his training, as he helps all Yardmaster Trainees who train at his station (*Id.*, ¶ 134).   Yardmaster Trainees typically work closely with the Yardmaster at the station and keep their own paper turnover sheet to practice, so if a Yardmaster had removed his or her turnover sheet, the Yardmaster Trainee would usually have been paying attention to the comings and goings in the yard and would have his or her own copy of the turnover sheet to reference (*Id.*, ¶ 135).

Regarding Mr. Scott's complaints that he was left alone at times by Mr. Matthews and Mr. Russell, it is not uncommon for Yardmaster Trainees to be left alone in order to gain independent experience, especially toward the end of training, to "see how they handle it" before the ultimate qualification decision (*Id.*, ¶ 136).

Mr. Scott did not complain about Mr. Roberts discriminating against him because of his race (*Id.*, ¶ 137).   Mr. Roberts recruited Mr. Scott for the Yardmaster Trainee position and advocated for his selection because he thought he was a good candidate (*Id.*, ¶ 138).

Mr. Scott believes that "they" were trying to get rid of him from the beginning "because every, how everything started, even with the Yardmaster, Yardmaster meeting stating that I was cussing out managers, and all of this other stuff, to Clay [Matthews] leaving me alone the very first day after a few minutes, I mean, every other time. I don't think I got a fair shot at all with any of this." (*Id.*, ¶ 139).

Mr. Scott admits that there were days when he did not stay for the entire twelve-hour shift of his Yardmaster mentors (*Id.*, ¶ 140).

Mr. Roberts "absolutely" wanted Mr. Scott to succeed because it is "very, very disheartening when [Union Pacific] ha[s] candidates that don't make it, because that means [Union Pacific] ha[s] to start all over with the process," and "it takes a considerable amount of time to get

someone started training again" after posting the open position, interviewing and selecting new candidates, and waiting for those candidates to train (*Id.*, ¶ 141).

At the time that Union Pacific filed its motion, Union Pacific had fifteen (15) active Yardmasters, and two employees qualified as Yardmasters, but "cut back." (*Id.*, ¶ 142). One of the "cut back" but qualified Yardmasters is Mr. Davis, who is white, and the other is Joseph Fisher, who is black (*Id.*, ¶ 143). Mr. Scott could not name any person, regardless of race, who he thought received more favorable treatment than he did (*Id.*, ¶ 144). Mr. Scott did not qualify as a Yardmaster solely because of his poor performance during training (*Id.*, ¶ 145).

Under Union Pacific's Yardmaster CBA, it is allowed to employ five (5) qualified Yardmasters per station (*Id.*, ¶ 146). With three stations in the North Little Rock yard, there are 15 qualified Yardmasters who actually hold the position, work as Yardmasters, and draw Yardmaster pay (*Id.*, ¶ 147). Mr. Scott admits that it is common for Union Pacific to have individuals "cut back" so that if someone leaves or is injured, Union Pacific can quickly fill positions with trained and qualified individuals on an as-needed basis (*Id.*, ¶ 148).

Mr. Scott's key complaint is that Mr. Davis was placed ahead of him in Yardmaster seniority (*Id.*, ¶ 149). As of the date that Union Pacific filed its motion for summary judgment, Mr. Davis was not yet working as a Yardmaster, but rather was qualified as a Yardmaster and was first in line on the "cut back" list, which means he will fill the next Yardmaster slot that opens (*Id.*, ¶ 150). Even if Mr. Scott had been the selection committee's first choice as a Yardmaster Trainee candidate, had started his training process before Mr. Davis, and had performed well enough during his training to qualify as a Yardmaster, he would not, as of the time that Union Pacific filed its motion for summary judgment, have been working as a Yardmaster or receiving Yardmaster pay, as there simply had not been an opening of a Yardmaster Position since the time Mr. Davis

24

and Mr. Scott began training until Union Pacific filed its motion for summary judgment (*Id*., ¶ 151).

## II.     Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that

there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366

(8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary

judgment, which is a useful pretrial tool to determine whether any case, including one alleging

discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011)

(en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)).  "Although

employment discrimination cases are 'often fact intensive and dependent on nuance in the

workplace, they are not immune from summary judgment.'"  *Trierweiler v. Wells Fargo Bank*,

639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077).  "An employer is entitled

to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory

reason for the employer's decision."  *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1047

(8th Cir. 2002) (internal quotations and citations omitted).

### III.     Analysis

#### A.     Preemption

Union Pacific argues that this Court lacks jurisdiction over Mr. Scott's complaint because

federal courts lack jurisdiction over all "minor disputes" covered by the Railway Labor Act's

("RLA") mandatory arbitration provisions and the Court should dismiss the Amended Complaint

with prejudice (Dkt. No. 47, at 30 (citing *Deneed v. Nw. Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir.

1998) (citing 45 U.S.C. § 151a))).

In *Gore v. Trans World Airlines*, the Eighth Circuit held that the RLA, in certain

circumstances, completely preempts state-law claims.   210 F.3d 944, 949 (8th Cir. 2000).

"Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id*. "Under the RLA, parties are obligated to arbitrate minor disputes, which are controversies arising out of the application or interpretation of the collective bargaining agreement." *Id*. (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256-59 (1994)). Claims of preemption under the RLA are governed by a standard that determines "a cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the [collective bargaining agreement]." *Gore*, 210 F.3d at 949 (quoting *Hawaiian Airlines, Inc.*, 512 U.S. at 260). Where the resolution of the claim "depends on an interpretation of the [collective bargaining agreement], the claim is pre-empted." *Id*. (quoting *Hawaiian Airlines, Inc.*, 512 U.S. at 261). There is a rebuttable presumption that disputes between a railroad and its union employees are minor and, therefore, arbitrable under the RLA. *See Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997).

The Court notes that, if the claim is a "minor dispute" and is therefore completely preempted by the RLA, the proper remedy is dismissal of the claim. *Hawaiian Airlines, Inc.*, 512 U.S. at 256; *see* 45 U.S.C. § 184. An adjustment board has "mandatory, exclusive, and comprehensive" jurisdiction over minor disputes, and the remedies it provides are the "complete and final means for settling the minor disputes." *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38-39 (1963); *see Hastings v. Wilson*, Civ. No. 05-2566 (RHK/AJB), 2007 WL 333617, at *4 (D. Minn. Feb. 1, 2007) (dismissing action because the claim was preempted by the RLA); *Jenisio v. Ozark Airlines, Inc. Retirement Plan for Agent and Clerical Employees*, 187 F.3d 970, 973 (8th Cir. 1999) (quoting *Bhd. of Locomotive Eng'rs*, 373 U.S. at 39).

When examining preemption based on the RLA, the Eighth Circuit Court of Appeals has determined:

> [P]urely factual questions about an employee's conduct or an employer's conduct and motives do not requir[e] a court to interpret any term of a collective bargaining agreement . . . .  Also a mere need to reference or consult a collective bargaining agreement during the course of state court litigation does not require preemption . . . .  Our preemption analysis focuses on a determination of whether the state-law claim confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.

*Gore*, 210 F.3d at 949 (internal quotations and citations omitted).

In *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc*., 372 U.S. 714 (1963), the Supreme Court determined that a state law racial discrimination claim was not barred by the RLA.  The Court determined that the state action was not preempted by the RLA because it was sufficiently independent of the RLA grievance mechanism, the activity regulated involved legitimate state interests, and an analysis of the collective bargaining agreement was not required.  372 U.S. at 724.  In *Gore*, when examining this issue, the Eighth Circuit affirmed the district court's determination that the plaintiff's state-law claims were preempted because they were inextricably intertwined with a consideration or interpretation of the collective bargaining agreement.  210 F.3d at 950.  The plaintiff in *Gore* claimed false arrest, negligence, libel and slander, and invasion of privacy under Missouri state law.  *Id*. at 949.  To prevail on his claims, plaintiff had to prove certain facts regarding defendants' conduct with respect to each claim.  *Id*. at 950 (that defendants' actions were "without legal justification" for the false arrest claim), at 950 (that defendants' publication of statements was with the requisite degree of fault for libel and slander claims), at 951 (that defendants breached a duty in investigating a claim of a threat for negligence claim), at 951 (that defendants' actions were unreasonable in obtaining and disclosing

private information or that disclosure would be highly offensive to a reasonable person for false light claim).  Relying on the relative rights and duties contained within the parties' collective bargaining agreement, to defend against each claim, defendants maintained that their actions were required according to their interpretation of specific provisions in the collective bargaining agreement.  *Id*. at 950-51.  The *Gore* court concluded that plaintiff's claims were rooted in an interpretation of the collective bargaining agreement, that plaintiff could not succeed on his claim without interpreting certain terms of the collective bargaining agreement, and that plaintiff had in effect artfully pleaded his claims to avoid preemption.  *Id*. at 951.  Because plaintiff could not "establish liability on his tort claims without demonstrating that defendants' actions were wrongful under a proper interpretation of the relevant rights and duties bargained for in the collective bargaining agreement," the *Gore* court affirmed the district court's decision and considered plaintiff's claims preempted.  *Id*. at 952.

Likewise, in *Boldt v. Northern States Power Company*, 904 F.3d 586 (8th Cir. 2018), the Eighth Circuit affirmed the district court's decision that plaintiff's claim alleging disability discrimination under the Minnesota Human Rights Act ("MHRA") based on perceived disability was preempted by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  To analyze preemption under the RLA and LMRA, courts apply the same analysis.  *See Gore*, 210 F.3d at 949 ("[c]laims of preemption under the RLA are governed by a standard that is 'virtually identical' to that employed" under § 301 of the LMRA).  To analyze the MHRA disability discrimination claim, the court applied the "familiar three-step McDonnell Douglas framework . . . ."  *Boldt*, 904 F.3d at 591.  The Eighth Circuit determined the parties' collective bargaining agreement incorporated the employer's fitness-for-duty policy.  *Id*. at 592.  Then, the court determined that, to establish

his claim under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), plaintiff had to prove that he was "qualified" to continue working. *Id.*

The *Boldt* court reasoned that plaintiff could not "prevail on his disability-discrimination claim without proving that he was qualified to work 'under a proper interpretation of the relevant rights and duties' incorporated into the collective-bargaining agreement" and that defendant employer argued "the actions it took against Boldt, including placing conditions on his reinstatement, 'were required according to' its interpretation of the collective-bargaining agreement and its fitness-for-duty policy." *Id.* at 593 (citing *Gore*, 210 F.3d at 950, 952). As a result, the *Boldt* court concluded that, because the plaintiff's "claim [wa]s 'substantially dependent on analysis of [the] collective-bargaining agreement,'" his state law MHRA claim was preempted by § 3 of the LMRA. *Id.* (alteration in original) (quoting *Caterpillar, Inc.*, 482 U.S. at 394). The *Boldt* court specifically declined to reach the question of whether interpretation of the collective-bargaining agreement would be necessary at steps two and three of the *McDonnell Douglas* framework so as to trigger complete preemption because the court determined the district court would need to interpret the fitness-for-duty policy to determine whether the plaintiff established his *prima facie* case and because the outcome of the case would be the same regardless. *Id.* at 592 n.2.

The RLA may preclude federal claims, as well. The analysis for determining whether federal claims are precluded is similar for determining whether state law claims are preempted. *See*, *e.g.*, *Pittari v. American Eagle Airlines, Inc.*, 468 F.3d 1056, 1060 (8th Cir. 2006) (examining whether plaintiff's claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, were precluded by the RLA); *Deneen*, 132 F.3d at 439 (examining whether plaintiff's claims under the federal Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), were precluded by

the RLA); *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995) (examining whether plaintiff's claim under the ADA was precluded by the RLA); *Bowe v. Nw. Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir. 1992) (examining whether plaintiff's claim under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*, was precluded by the RLA); *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 832-34 (7th Cir. 2014) (examining whether plaintiff's Title VII claim was precluded by the RLA).

Federal statutory claims may be precluded by the RLA "when the heart of the dispute between the parties is a disagreement over the interpretation of some part of a CBA . . . ." *Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 664 (7th Cir. 2001); *see Roslyn v. Nw. Airlines, Inc.*, Case No. 05-0441 (PAM/RLE), 2005 WL 1529937, at *2 (D. Minn. June 29, 2005) ("Thus, the Court is persuaded that . . . a federal claim is precluded by the RLA only if the claim depends on the interpretation of the CBA for its resolution."). The Court also notes that the elements of racial discrimination and retaliation claims under § 1981 are the same as the elements of racial discrimination and retaliation claims under the ACRA. *See Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) (determining that the analysis for discrimination claims is the same under Title VII, § 1981, and the ACRA); *Robinson v. American Red Cross*, 753 F.3d 749, 756-57 (8th Cir. 2014) (analyzing under the same legal framework retaliation claims under Title VII and the ACRA); *Wright v. St. Vincent Health System*, 730 F.3d 732, 737 (8th Cir. 2013) (determining that the elements of retaliation claims under Title VII and § 1981 are the same); *Hill v. City of Pine Bluff, Ark.*, 696 F.3d 709, 715-16 (8th Cir. 2012) (analyzing ACRA retaliation claims under the same substantive standards as retaliation claims under Title VII); *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005) (determining that the analysis for discrimination claims is the same under Title VII, § 1981, and the ACRA).

1.      **Race Discrimination Claim**

The Court must determine whether, in evaluating Mr. Scott's race discrimination claim against Union Pacific, it will be "'require[d]' to interpret 'some specific provision' of the collective bargaining agreement." *Boldt*, 904 F.3d at 591 (quoting *Meyer v. Schnucks Markets, Inc.*, 163 F.3d 1048, 1051 (1998)).  To assess a claim for racial discrimination in the absence of direct evidence, the Court applies the burden-shifting analysis from *McDonnell Douglas*.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (en banc).  Under this framework, the plaintiff bears the burden of establishing a *prima facie* case of racial discrimination.  *Id*. at 1046. To establish a *prima facie* case of racial discrimination, Mr. Scott must show that:  "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)).

Union Pacific argues that Mr. Scott's racial discrimination claim against Union Pacific fails because Mr. Scott was not meeting the legitimate expectations of Union Pacific due to his attendance problems, given his failure to demonstrate a mastery of the skills required of Yardmaster, and because he has failed to point to a similarly-situated applicant outside of his protected class who was treated differently (Dkt. No. 47, at 38-41).  Mr. Scott responds that he is a member of a protected class, was "qualified for, applied for the position of Yardmaster trainee, was selected in the #2 position and despite being qualified, was rejected for the position.  Given that Union Pacific, did not then re-post the Yardmaster Trainee position for over one year and perhaps almost two years, proves my point that they never intended to hire two 'cut-back' positions

and only selected an African-American to avoid getting in trouble with the EEOC." (Dkt. No. 53, at 13).   The undisputed evidence in the record shows, however, that Joseph Fisher, who was African-America and was the hiring committee's designated alternate, began Yardmaster training in or around February 2018, and because he performed admirably, Mr. Steinkamp qualified Mr. Fisher for the Yardmaster position (Dkt. No. 45-13, ¶ 75, 86).

The undisputed record evidence shows that Union Pacific, *via* its Yardmaster CBA, had a policy that Yardmasters who attend formal training "will be paid a minimum of eight (8) hours pay at the General Yardmaster rate of pay." (Dkt. No. 45-3, at  4).   Yardmaster Trainees are expected to spend about three to four weeks, depending on the speed with which they display competence, training at each station under the guidance and supervision of an experienced Yardmaster (*Id.*, ¶ 25).   Regular Yardmaster shifts are 12 hours long (*Id.*, ¶ 27).   Although Yardmaster Trainees are not required to work the full 12 hours of each of their mentors' shifts, they are salaried employees, and they are expected to work "a minimum of 8" hours a day, "but most of them would stay for 10 or 12 . . . just to get that extra experience." (*Id.*, ¶ 28).   If a Yardmaster Trainee wants to master all of the skills necessary to qualify as a Yardmaster, it is critical to make the most of the experience available at each shift and at each station because "the company allows 30 days per station" for training, and most Yardmaster Trainees "stay for 10 or 12 [hours] . . . just to get that extra experience . . . to make the most of it." (*Id.*, ¶ 29).

Article Nine of the Yardmaster CBA governs "Promotion and Disqualification."   It provides:

> A.     In making promotions to yardmaster under the provisions of Article 11, ability, merit, fitness and seniority shall be considered.   Ability, merit and fitness sufficient, seniority shall prevail.   The designated representative of the Company shall be the judge of ability, merit and fitness.

33

B.      Newly promoted yardmasters will be on probation for a period of forty-five (45) shifts worked, exclusive of training (under the provisions of Article 11). During the probationary period, newly promoted yardmasters may be disqualified without an investigation and without recourse as to just cause.

C.      A yardmaster who has completed the forty-five (45) shift probationary period set forth in Section b of this Article and has been given a seniority date and who is assigned to a bulletined position or who makes displacement will be placed on the position and given a reasonable time in which to demonstrate fitness and ability to work the position satisfactorily.  Failure to qualify to work the position will not result in loss of seniority and such yardmaster who fails to qualify may displace a junior yardmaster at that location who occupies a position for which the yardmaster is qualified.  If such yardmaster desires to do so, they may request an investigation under the provisions of Article 17 to determine the facts.  If the investigation shows that disqualification was improper, such yardmaster will be restored to the position.

(Dkt. No. 43-3, at 10).

Article 11 of the Yardmaster CBA governs seniority.  It provides that Yardmasters constitute one seniority class, and "upon successful completion of training" and after being "deemed by the Company to be qualified to work as a yardmaster, employees will be given yardmaster seniority date retroactive to the date of their first paid training shift.  Where two (2) or more applicants have their first paid training shift on the same date, their relative seniority rank shall be based upon the length of continuous service with the Company." (Dkt. No. 45-3, at 16).

During his deposition, Mr. Scott testified that the reason that he believes that Mr. Davis should not have been selected as the first choice for Yardmaster Trainee is "seniority." (Dkt. No. 46, ¶ 63).  Mr. Scott testified during his deposition that he did not think it was fair that Mr. Davis was rated more qualified than he was even with prior management experience and a college degree because "it's based on Union Pacific seniority.  I mean, how much working time did he have, you know, where he had straight working time as a switchman, whatever, compared to the time that even I had out there." (*Id.*, ¶ 65).  In support of his position, Mr. Scott points to Article Nine of the Yardmaster CBA's reference to "seniority" as something that the Company can consider in making

34

a promotion decision to argue that, based on his seniority, he should have been the hiring committee's number one choice for the Yardmaster Trainee position (Dkt. No. 53, at 26 ¶ 63). Additionally, Mr. Scott points to Article 11 to argue that, if he had been the hiring committee's number one choice based on his seniority, he should have started training first or at the same time as Mr. Davis, and he would have had seniority over Mr. Davis as a Yardmaster based on his length of continuous service with Union Pacific (Dkt. No. 53, at 13, 26 ¶ 63).

Mr. Scott also testified that he did not have a fair opportunity to qualify for the position of Yardmaster.  Mr. Scott thinks that Mr. Steinkamp did not have "any intentions to qualify [Mr. Scott] at all anyway, and [he] just felt like [Mr. Steinkamp] just—it was just a—it was just a show. It was just a coverup, really . . . that's just how [Mr. Scott] feel[s]." (*Id.*, ¶ 110).

Here, viewing the record evidence in the light most favorable to Mr. Scott, the Court concludes that it must interpret the Yardmaster CBA's provisions on Promotion and Disqualification to determine whether Mr. Scott was meeting his employer's legitimate job expectations in order to be qualified to be promoted to the position of Yardmaster.  The Yardmaster CBA provides for the training period for newly promoted Yardmasters which Mr. Scott claims was inadequate, and the Yardmaster CBA also provides for disqualification without investigation and without recourse as to just cause which Mr. Scott also raises as a cause for his failure to promote to Yardmaster.

Further, the Court finds that, even if Mr. Scott can prevail on a *prima facia* case of race discrimination without proving that he was qualified to work under a proper interpretation of the relevant rights and duties incorporated into Yardmaster CBA, in this case, Union Pacific's defense is that it was entitled to not qualify Mr. Scott for a transfer because he had problems with absences and was not performing the job of Yardmaster at a proficient level to qualify him for the position

under the Yardmaster CBA. Mr. Scott disputes that and argues that he met the legitimate expectations of Union Pacific. Here, there was a mechanism provided in the Yardmaster CBA for Mr. Scott to challenge his failure to qualify to be promoted to the Yardmaster position. The Yardmaster CBA provided Mr. Scott the opportunity to "request an investigation under the provision of Article 17, to determine the facts," and "'[i]f the investigation shows that disqualification was improper such yardmaster will be restored to that position." (Dkt. No. 45-3, at 10). Based on the undisputed evidence in the record, Mr. Scott did not take advantage of that provision of the Yardmaster CBA and request an investigation.

Additionally, the Court concludes that, to determine whether Mr. Scott was rejected in favor of a similarly situated applicant outside of his protected class or was otherwise treated differently than such an applicant, the Court must assess the Yardmaster CBA. Mr. Scott asserts that he was treated differently than Mr. Davis a Caucasian Yardmaster Trainee during the hiring process because his seniority was not properly considered under Article Nine. Union Pacific asserts that both Mr. Davis and Mr. Scott were selected as Yardmaster Trainees, that they were not competing against each other for a single position, and that Mr. Davis's qualification had no bearing on Mr. Scott's opportunity to qualify as a Yardmaster. Mr. Scott asserts, however, that Union Pacific never intended to qualify two Yardmasters. The Court's analysis of whether Mr. Scott and Mr. Davis were similarly situated requires that the Court analyze the Promotion and Disqualification as well as the Seniority provisions of the Yardmaster CBA.

Based upon the foregoing discussion and viewing the record evidence in the light most favorable to Mr. Scott, the Court concludes that the success of Mr. Scott' race discrimination claims against Union Pacific, given the nature of Mr. Scott's claim and Union Pacific's defenses, are substantially dependent upon an analysis of the Yardmaster CBA. The race discrimination

claims against Union Pacific are therefore "minor" grievances that are completely preempted and precluded by the RLA. Accordingly, the Court concludes that Mr. Scott' race discrimination claims against Union Pacific are subject to mandatory binding arbitration under the RLA. The Court dismisses with prejudice Mr. Scott' race discrimination claims against Union Pacific.

### 2.    Retaliation Claims

The Court concludes that Mr. Scott' retaliation claim is also preempted and precluded by the RLA. As the Court understands Mr. Scott's retaliation claim, Mr. Scott states in his amended complaint that, around September 2017, he learned from an African-American male co-worker, Darvis Rasberry, that his name was brought up in the Yardmaster meeting because it was said that Mr. Scott had argued with Mr. Steinkamp and Mike Scholts about the fact that Mr. Davis was starting training before Mr. Scott because Mr. Davis was the hiring committee's number one choice (Dkt. No. 15, ¶ 27). Mr. Scott asserts that Mr. Matthews also mentioned this same incident when he came to the Freight House on October 6, 2017 (*Id*., ¶ 28). Mr. Scott contends that he asked Mr. Roberts, Mr. Steinkamp, and Mr. Scholts questions about his start date because he had a vacation scheduled along with a wedding in Atlanta a few days after the trip and that, in response to his questions, "white management put a label on Plaintiff as if he was an angry black man." (*Id*., ¶ 29). Mr. Scott asserts that at the time he was training his replacement for peer training and did not go to the crest where Yardmasters work for weeks, but Mr. Scholts and Mr. Steinkamp "repeatedly said Plaintiff stayed up there every day arguing about seniority in the yardmaster meeting." (*Id*., ¶ 33). Mr. Scott wrote a letter to Robbie Robelot about the favoritism being displayed (*Id*., ¶ 35). Mr. Scott asserts that Yardmaster training for him was horrible; he was "left alone" by those who were close to Mr. Steinkamp, Mr. Matthews, and Mr. Russel; and he believes "most of them" were trying to force him to quit (*Id*., ¶¶ 41-42).

Additionally, in his amended complaint Mr. Scott contends that he reported to Mr. Steinkamp "how he was being treated as far as training and Steinkamp ignored him" (*Id.*, ¶ 57). Mr. Scott also reported to Manager Chad Billson that "Kevin Russel would not login for [Mr. Scott] and Steinkamp would not do anything about it" (*Id.*, ¶ 79). Mr. Scott "believes Kevin Russel and Andrew Steinkamp were trying to set me up . . . . The next day, 01/19/2018, [Mr. Scott] went to work on the Hump and Steinkamp called [Mr. Scott] downstairs and said that he was not going to qualify [Mr. Scott] as a yardmaster because of, 'not having the want to and because I wouldn't push the crews to work harder.'"(*Id.*, ¶ 83).

To establish a *prima facie* retaliation claim, Mr. Scott must show that:  (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.  *Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013); *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011).  Once *the prima facie* case is established, the familiar burden shifting analysis applies.  Union Pacific must offer a legitimate, nonretaliatory reason for its actions.  If Union Pacific does so, then Mr. Scott must prove that the proffered reason is pretextual and that retaliation was the reason for the action.  *See Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014) (determining that § 1981 retaliation claims are analyzed under the same *McDonnell Dougla*s burden shifting framework as Title VII retaliation claims); *Johnson v. Windstream Communications, Inc.*, 545 S.W.3d 234, 241 (Ark. Ct. App. 2018) (applying the burden shifting analysis to retaliation claims under the ACRA).

To assess whether there is a causal relationship between Mr. Scott' failure to be qualified and promoted to Yardmaster and what the Court believes to be his asserted protected activity, the Court must inquire about why Mr. Scott was not promoted.  As discussed in the preceding section,

to assess why Mr. Scott was not promoted necessarily entails an investigation into the substance and meaning of the Yardmaster CBA's Promotion and Disqualification provision.  Even if not necessary at the *prima facie* stage to determine why Mr. Scott was not promoted, such an analysis would be necessary at the second and third stages of the analysis.

At the second stage, the burden shifts to Union Pacific to articulate a legitimate, non-retaliatory reason for its decision not to promote Mr. Scott.  As already discussed, defendants assert that Mr. Scott was not promoted because he had a problem with absences, and he did not demonstrate a mastery of the skills required of a Yardmaster or a willingness to perform the job.  To determine whether this proffered reason is legitimate and nonretaliatory requires the Court to determine whether Mr. Scott was properly disqualified under the terms of the Yardmaster CBA.

Additionally, at the third stage, Mr. Scott must prove that his termination was causally linked to the protected conduct.  Based on this Court's review of the applicable law, but-for causation applies to retaliation claims under Title VII and the ACRA.  *See Wright*, 730 F.3d at 737 (determining that under Title VII and § 1981, to establish causation, plaintiff must prove the desire to retaliate was the but-for cause of her termination); *Johnson*, 545 S.W.3d at 241 (applying but-for causation to plaintiff's retaliation claims under the ADA and ACRA); *see also Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 477 (8th Cir. 2010) ("We analyze Burkhart's Title VII and ACRA retaliation claims in the same manner.") (citation omitted); *Killingsworth v. Union Pacific R.R. Co.*, No. 4:15-cv-00647-SWW, 2016 WL 5842875 (E.D. Ark. Oct. 4, 2016) (stating that "[r]etaliation claims under 42 U.S.C. § 1981, Title VII and ACRA are evaluated under the same standards").  On the record evidence before the Court, a but-for causation determination necessarily implicates the same factual issues regarding Mr. Scott' alleged contacts with Union

Pacific supervisors and an interpretation of whether he was properly disqualified under the Yardmaster CBA.

Based upon the foregoing discussion and viewing the record evidence in the light most favorable to Mr. Scott, the Court concludes that the success of Mr. Scott' retaliation claims against Union Pacific is substantially dependent upon an analysis of the Yardmaster CBA.  The retaliation claims against Union Pacific is therefore "minor" grievances that is completely preempted and precluded by the RLA.  Accordingly, the Court concludes that Mr. Scott' retaliation claim against Union Pacific is subject to mandatory binding arbitration under the RLA.  The Court dismisses with prejudice Mr. Scott' retaliation claim against Union Pacific.

### 3.    Hostile Work Environment

The Court concludes that Mr. Scott' hostile work environment claim is not preempted and precluded by the RLA.  To establish a *prima facie* case of hostile work environment harassment, Mr. Scott must show:  (1) that he is a member of a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his membership in the protected group; and (4) that the harassment affected a term, condition, or privilege of his employment.  *Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 540 (8th Cir. 2014).  He must also demonstrate that a supervisor caused the harassment.  *See Gordon v. Shafer Contracting Co.*, *Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006).  In the alternative, if his hostile work environment claim is based on harassment by someone other than his supervisor, such as a co-worker, he must also prove that the employer "knew or should have known of the harassment and failed to take proper remedial action."  *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018).

Considering the record in the light most favorable to Mr. Scott, he alleges that he was subject to harassment because he was "left alone" during training by his Yardmaster trainers and

because he did not have access to login to the computer as a Yardmaster (Dkt. No. 46, ¶ 126-128, 130, 132).  Mr. Scott asserts that this effected his ability to qualify as a Yardmaster and be promoted.  The Court does not see that an assessment of Mr. Scott's hostile work environment claim necessarily entails an investigation into the substance and meaning of the Yardmaster CBA. Accordingly, the Court concludes that Mr. Scott' hostile work environment claim against Union Pacific is not subject to mandatory binding arbitration under the RLA.

### B.      Hostile Work Environment Claim

As set forth above, to establish a *prima facie* case of hostile work environment, Mr. Scott must show:  (1) that he is a member of a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his membership in the protected group; and (4) that the harassment affected a term, condition, or privilege of his employment.  *Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 540 (8th Cir. 2014).  He must also demonstrate that a supervisor caused the harassment.  *See Gordon v. Shafer Contracting Co.*, *Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006).  In the alternative, if his hostile work environment claim is based on harassment by a someone other than his supervisor, such as a co-worker, he must also prove that the employer "knew or should have known of the harassment and failed to take proper remedial action."  *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018).

Considering the record in the light most favorable to Mr. Scott, he alleges as set forth above, that his name was brought up in the Yardmaster meeting because it was said that Mr. Scott had argued with Mr. Steinkamp and Mike Scholts about the fact that Mr. Davis was starting training before Mr. Scott (Dkt. No. 15, ¶ 27).  Mr. Scott asserts that Mr. Matthews also mentioned this same incident when he came to the Freight House on October 6, 2017, and that because of questions about his start date "white management put a label on [Mr. Scott] as if he was an angry

black man." (*Id.*, ¶ 29).  Mr. Scott maintains that he was subject to race-based harassment because he was "left alone" on his "very first day" on the job "as a Yardmaster to ensure the safety in the lives of the others" and he was "sitting there with no access, or just anything . . . ." (Dkt. No. 45-5, at 67).  Mr. Scott believes that he was left alone because of his race (*Id.*).  Mr. Scott asserts that Yardmaster training for him was horrible; he was "left alone" by those who were close to Mr. Steinkamp, Mr. Matthews, and Mr. Russel; and he believe "most of them" were trying to force him to quit (*Id.*, ¶¶ 41-42).  Mr. Scott contends that he could never login to any computers as a Yardmaster during his training (*Id.*, ¶ 54).

Harassment "standards are demanding—to be actionable, conduct must be extreme and not merely rude or unpleasant." *Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir. 2003)).  More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment. *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir. 1999).  Mr. Scott must prove that the workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).  Courts consider the "totality of the circumstances" to determine whether a work environment is hostile or abusive. *Baker v. John Morrell & Co.,* 382 F.3d 816, 828 (8th Cir. 2004). For example, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

The Court has examined all of the record evidence.  When asked whether anyone in Union Pacific's management had made any race-related statements to him Mr. Scott replied, "I don't know." (Dkt. No. 45-5, at 67).  Construing the record evidence in the light most favorable to Mr. Scott, the Court concludes that Mr. Scott has not come forward with any evidence of comments

from supervisors or co-workers or evidence of intimidation, ridicule or insult that are sufficiently severe or pervasive to meet the high bar of establishing a hostile work environment sufficient to defeat Union Pacific's motion for summary judgment on this claim. *See Clay v. Credit Bureau Enter., Inc.*, 754 F.3d 535, 538 (8th Cir. 2014) (affirming district court's grant of summary judgment for employer on employee's hostile work environment claim alleging that she was treated differently than her white co-workers, either by being disciplined more harshly, by being passed over for promotions despite her qualifications, or by being denied other types of preferential treatment that white employees enjoyed).

IV.     **Conclusion**

The Court determines that the RLA preempts and precludes Mr. Scotts' race discrimination and retaliation claims. Accordingly, the Court dismisses Mr. Scott's race discrimination and retaliation claims with prejudice and denies as moot Union Pacific's motion for summary judgment as to those claims (Dkt. No. 45). The Court determines that the RLA does not preempt and preclude Mr. Scott's hostile work environment claim. However, the Court grants Union Pacific's motion for summary judgment as to Mr. Scott's hostile work environment claim (Dkt. No. 45). The Court denies as moot Union Pacific's unopposed motion to continue trial setting and suspend pretrial deadlines (Dkt. No. 59).

It is so ordered this 31st day of March, 2022.

*Kristine G. Baker*
Kristine G. Baker
United States District Judge